## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT

**DANIEL P. KANAAN**,

        Plaintiff,

v

**MICHAEL A. FALSETTI, KRISTIN JOHNSON, KEITH STONE, JONATHAN SIRKEN, NATHAN ZAUTCKE, ADAM WIENER, DOMINIC FALSETTI, ADVANCED COMMUNICATIONS, INC**. a Michigan corporation, **M&D AUTO, LLC,** a Michigan limited liability company, **FKS PROPERTIES, LLC**, a Michigan limited liability company, **FALKAN ENTERPRISES, LLC**, a Michigan limited liability company; and **UNNAMED COCONSPIRATORS JOHN** and **JANE DOES** 1 through 100

jointly and individually,

        Defendants.

Case No.  2012-          -
Hon.

---

Lynn M. Brimer (P43291)
George S. Fish (P51298)
Strobl & Sharp, P.C.
Attorneys for Plaintiff
300 East Long Lake Road, Suite 200
Bloomfield Hills MI 48304-2376
(248) 205-2764  Fax (248) 205- 2788
lbrimer@stroblpc.com
gfish@stroblpc.com

---

## **VERIFIED COMPLAINT**

NOW COMES Plaintiffs Daniel P. Kanaan, Advanced Communications, Inc., M&D Auto, LLC, FKS Properties, LLC, and Falkan Enterprises, LLC by and through their attorneys, Strobl & Sharp, P.C., and for their Verified Complaint against Defendants state as follows:

## THE PARTIES

1. Plaintiff Daniel P. Kanaan ("Kanaan") is an individual who resides in Wayne County, Michigan.

2. Defendant Advanced Communications, Inc. ("ACI") is a Michigan corporation with its principal place of business in Wayne County, Michigan.

3. Defendant M&D Auto, LLC, ("M&D") is a Michigan limited liability company with its principal place of business in Wayne County, Michigan.

4. Defendant FKS Properties, LLC, ("FKS") is a Michigan limited liability company with its principal place of business in Wayne County, Michigan.

5. Defendant Falkan Enterprises, LLC, ("Falkan") is a Michigan limited liability company with its principal place of business in Wayne County, Michigan (collectively Kanaan, ACI, M&D, FKS and Falkan shall, from time-to-time be referred to as "Plaintiffs").

6. Defendant Michael A. Falsetti ("MFalsetti") is an individual who resides in Wayne County, Michigan.

7. Defendant Kristin Johnson ("Johnson") is an individual who at all times relevant herein resided in Wayne County, Michigan.

8. Defendant Keith Stone ("Stone") is an individual who resides in Wayne County, Michigan.

9. Defendant Jonathan Sirken ("Sirken") is an individual who resides in Wayne County, Michigan.

10. Defendant Nathan Zautcke ("Zautcke") is an individual who resides in Wayne County, Michigan.

11.   Defendant Adam Wiener ("Wiener") is an individual who resides in Wayne County, Michigan.

12.   Defendant Dominic Falsetti ("DFalsetti") is an individual who resides in Wayne County, Michigan (collectively, MFalsetti, Johnson, Stone, Sirkin, Zautcke, and DFalsetti shall be referred to as "Defendants").

## JURISDICTION AND VENUE

13.   This Court has original federal question jurisdiction over this matter under 28 U.S.C. § 1331 pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

14.   This Court has jurisdiction over Plaintiffs state law claims based on its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15.   The amount in controversy is in excess of Seventy-Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest and costs.

16.   Venue is proper in this District as at all times relevant herein Defendants resided in or maintained a residence in this District and a substantial part of the events and actions giving rise to Plaintiffs' claims occurred in this District.

## GENERAL ALLEGATIONS

### A. Background of ACI

17.   ACI is a telecommunications service provider incorporated in 1984 by MFalsetti, Jeff Gendron and Jay Gendron.

18.   In about 1984, Kanaan became an ACI employee and was given a 10% equity interest in the Company.

19. ACI began as a local residential cable installation company with annual revenues in 1984 under Three Hundred Thousand and 00/100 ($300,000.00) Dollars.

20. Through extensive sales efforts, ACI developed into a full-service provider of technical services specializing in the design, construction, installation and maintenance of complicated infrastructure systems for voice, video and data networks and grew its annual revenue to over One Hundred Million and 00/100 ($100,000,000.00) Dollars.

21. Sometime after 1984, Kanaan and MFalsetti became the sole shareholders of ACI.

22. Since about 1994, MFalsetti has been the 60% shareholder in ACI and Kanaan has been the 40% shareholder in ACI.

23. Since 1994, MFalsetti has been the President and Chief Executive Officer of ACI, responsible for managing the financial affairs of the Company.

24. Since becoming the 40% shareholder in ACI, Kanaan has been its Executive Vice-President and Chief Operating Officer responsible for sales and field operations.

25. Kanaan has never been involved in the financial reporting by ACI.

26. Johnson was hired by ACI in about 2005 and was its Secretary/Treasurer and Chief Financial Officer ("CFO") until sometime in 2011.

27. In her capacity as CFO, Johnson reported directly to MFalsetti.

28. In her capacity as CFO, Johnson was involved in and partially responsible for, among other things, communication with ACI's primary secured lender, PNC Business Credit ("PNC" or the "Bank").

29.   Stone was hired by ACI on or about October 1, 1990, as it's Controller and served as its Controller from his date of hire until about August 2011.

30.   In his capacity as Controller, Stone was responsible for, among other things, maintaining ACI's records regarding accounts receivable and accounts payable.

31.   In his capacity as Controller, Stone reported directly to Johnson and MFalsetti.

32.   In his capacity as Controller, Stone was involved in ACI's communication with PNC.

33.   Sirken was hired by ACI on or about May 16, 2005, as its Chief Information Officer ("CIO").

34.   In his capacity as CIO, Sirken was responsible for all information technology maintained by ACI, including its software maintained to support ACI's accounting function.

35.   In his capacity as CIO, Sirken reported directly to MFalsetti.

36.   Zautcke was hired by ACI in about March 8, 2000, as its Purchasing and Asset Manager.

37.   In his capacity as the Fleet, Purchasing and Asset Manager, Zautcke was responsible for maintaining ACI records regarding assets and oversaw ACI's storage facility in which ACI accounting records, including accounts receivable records, invoicing and historical accounting documents, were stored.

38.   In his capacity as the Fleet, Purchasing and Asset Manager, Zautcke reported directly to MFalsetti.

39.   In his capacity as the Fleet, Purchasing and Asset Manager, Zautcke provided potential lenders with ACI financial information including its financial statements

reflecting its accounts receivable.

40. Weiner was hired by ACI in about March 16, 2006, to work in its Information Technology Department.

41. As an ACI employee working in the Information Technology Department, Weiner was involved in the accounting software.

42. As an ACI employee working in the Information Technology Department, Weiner was responsible for establishing the pass codes for gaining access to the accounting software.

43. As an ACI employee working in the Information Technology Department, Weiner reported to Sirken and, from time-to-time, reported to Johnson.

44. DFalsetti was hired by ACI in about April 28, 2008 and was appointed as a Vice President responsible for sales and new business development.

45. DFalsetti has not performed services for ACI since about December 2009.

46. Although he did not perform any services for ACI, DFalsetti remained on the ACI payroll until July 11, 2011 and fraudulently collected wages from ACI.

47. In June 2011, ACI maintained a workforce of approximately 950 skilled technicians to service its customers and to support its operations.

48. In June 2011, ACI maintained a fleet of approximately 800 specially outfitted vehicles used in its daily operations to service its customers.

49. During the course of its operations, ACI serviced customers throughout the United States, with operations in eighteen (18) states.

      **B.**    **Background of M&D Auto**

50. M&D was organized by Kanaan and Falsetti on or about October 17, 2002.

51. Since its organization, Kanaan and Falsetti have each owned a fifty percent (50%) membership interest in the company.

52. M&D was established as a manager managed limited liability company.

53. Since its organization MFalsetti has served as its manager.

54. In its daily operations ACI must deploy vehicles that are specially outfitted to allow the ACI skilled labor force to fulfill their duties.

55. Prior to the organization of M&D, ACI outsourced the outfitting of its fleet to third party vendors.

56. In addition, prior to the organization of M&D, ACI outsourced all collision work on its fleet to third parties.

57. M&D was organized in part to perform the outfitting to the ACI fleet and as well as the collision and repair work on the ACI vehicles deployed in the southeastern Michigan region.

58. M&D also services the general public, providing general collision services to customers' automobiles.

59. In her capacity as the CFO of ACI, Johnson maintained the accounting records of M&D.

60. From about 2009, M&D maintained its deposit and checking accounts at a PNC Bank branch in the southeastern Michigan area (the "M&D PNC Account").

61. Initially, Kanaan and MFalsetti were signatories on the M&D PNC Account.

62. Upon information and believe, at sometime in about February 2011, without advising Kanaan, MFalsetti and/or Johnson removed Kanaan from the signature card on the M&D PNC Account.

63.     Without the consent or knowledge of Kanaan, MFalsetti and/or Johnson opened a certificate of deposit in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) in the name of M&D (the "M&D CD").

64.     Upon information and believe, ACI was the source of funds for the M&D CD.

### C.     Background of FKS

65.     FKS was organized by Kanaan, MFalsetti and Mark Saker ("Saker") in April 2001, with Saker owning a twenty-five percent (25%) membership interest and each Kanaan and MFalsetti each owning a thirty-seven and one-half percent (37.5%) membership interest in the company.

66.     In September 2009, Saker assigned and transferred his interest in FKS equally to Kanaan and MFalsetti such that Kanaan and MFalsetti each owned a fifty percent (50%) membership interest in the company.

67.     On October 27, 2006, FKS entered into a land contract for the purchase of the property located at 44146 Michigan Avenue, Canton, Michigan, which is the property out of which M&D operates.

68.     FKS has never had any employees.

69.     On information and belief, since she was hired by ACI, Johnson maintained the books and records of FKS.

70.     On information and believe, FKS maintained deposit and checking account(s) at PNC Bank.

71.     Kanaan has never reviewed the books and records of FKS.

72.     MFalsetti has failed and/or refused to provide Kanaan with access to the FKS bank account(s).

### D. Background of Falkan

73. Falkan was organized by Kanaan and MFalsetti in 2004 with each owning a fifty percent (50%) interest in the company.

74. Falkan owns the property located at 5711 Research Drive, Canton, Michigan, out of which ACI conducts its business, as well as the adjacent vacant property.

75. On information and belief, ACI has paid rental payments to Falkan since about the date ACI moved its operations to the facility located at 5711 Research Drive.

76. On information and belief, Falkan maintains deposit and checking account(s) at PNC Bank.

77. On information and belief, from the time she was hired by ACI, Johnson maintained the Falkan books and records with or under the direction of MFalsetti.

78. Kanaan has never reviewed the books and records of Falkan.

79. MFalsetti has failed and/or refused to provide Kanaan with access to the Falkan bank account(s).

### E. The PNC Debt

80. In about June 11, 2002, ACI entered into a Business Loan Agreement with National City Bank ("NatCity") in which NatCity extended a revolving line of credit loan facility to ACI (the "NatCity Line of Credit").

81. NatCity also extended a number of letters of credit on behalf of ACI (the "NatCity Letters of Credit").

82. The NatCity Line of Credit was an asset-based revolving line of credit predicated on a formula based chiefly on ACI's receivables.

83. Prior to advances under the NatCity Line of Credit, ACI would submit a Borrowing Base Report which would identify the assets available under the formula and establish the availability for further advances under the line of credit.

84. Through amendments and extensions, the NatCity Line of Credit ultimately was extended to an available revolving line of Twenty-Two Million and 00/100 ($22,000,000.00) Dollars.

85. The NatCity Line of Credit was secured by an all assets lien in all of ACI's assets and was guaranteed by Kanaan and MFalsetti.

86. On about March 15, 2008, NatCity's credit rating was downgraded to a "D" rating.

87. At some time in 2008, ACI's relationship with NatCity became troubled due to certain defaults by ACI under documents for the NatCity Line of Credit, including but not limited to the filing of a Notice of State Tax Lien against ACI by the State of Michigan, Department of Treasury.

88. At about March 2008, NatCity required ACI to retain the services of Conway McKenzie & Dunleavy ("CM&D") to assist with cash flow budgeting and the preparation of financial projections.

89. Charles Moore of CM&D ("Moore") became involved with the ACI account and assisted ACI in preparing its cash flow budget for presentation to NatCity.

90. In connection with the CM&D engagement with ACI, Moore reviewed, among other things, the ACI accounts receivable, accounts payable, bank records, cash flow projections and Borrowing Base Reports.

91. On April 4, 2008, MFalsetti emailed a Borrowing Base Report (the "April 4 Borrowing Base Report") to NatCity on behalf of ACI reflecting accounts

receivable with an approximate value of Twenty-Five Million One Hundred Eighty-Eight Thousand Two Hundred Sixty-Seven and 00/100 ($25,188,267.00) Dollars. See **Exhibit 1.**

92. On information and belief, the April 4 Borrowing Base Report was prepared by Stone and/or Johnson under the direction of MFalsetti.

93. On information and belief, MFalsetti reviewed the April 4 Borrowing Base Report prior to emailing it NatCity.

94. On information and belief, the April 4 Borrowing Base Report was reviewed by Moore.

95. On information and belief, Moore never raised any concerns with the information reflected on the April 4 Borrowing Base Report.

96. Kanaan did not participate in the preparation of the April 4 Borrowing Base Report.

97. Kanaan did not review the April 4 Borrowing Base Report.

98. At no time did Kanaan prepare, review or submit to NatCity any Borrowing Base Report on behalf of ACI.

99. On or about April 2, 2008, ACI entered into a forbearance letter agreement with NatCity (the "NatCity Letter Agreement").

100. On August 29, 2008, ACI entered into a formal Forbearance Agreement with NatCity extending the maturity date of the NatCity Indebtedness (the "NatCity Forbearance Agreement").

101. Over the following eleven months, the NatCity Forbearance Agreement was amended several times.

102. Ultimately, ACI and NatCity entered the Eighth Amendment to the Forbearance Agreement on or about July 12, 2009. A copy of the Eighth Amendment to the Forbearance Agreement is attached hereto as **Exhibit 2.**

103. At the time of the Eighth Amendment, the outstanding principal and interest due on the NatCity Line of Credit totaled Eighteen Million Eight Hundred Thirty-Six Thousand Six Hundred Fifty-Five and 59/100 ($18,836,655.59) Dollars.

104. In addition, at the time of the Eighth Amendment, NatCity had Three Million Three Hundred One Thousand Three Hundred Thirty and 00/100 ($3,301,330.00) in extended letters of credit on behalf of ACI.

105. CM&D continued to review the ACI cash flow and budgeting information in connection with the Forbearance Agreement at least through early June 2009.

106. At some time after the execution of the NatCity Letter Agreement, ACI began negotiating a financing relationship with PNC.

107. In October 2008, PNC Financial Services Group, Inc., the holding company owning PNC Business Credit, acquired 100% of the NatCity stock.

108. After the acquisition of the NatCity stock by PNC, ACI continued to negotiate with PNC to refinance the NatCity Line of Credit and to transfer the NatCity Letter of Credit to PNC.

109. On October 2, 2009, ACI entered into a Revolving Credit, Term Loan and Security Agreement with PNC for a maximum loan amount of Twenty-Eight Million and 00/100 ($28,000,000.00) Dollars with a maximum revolving line of credit of Twenty-Seven Million and 00/100 ($27,000,000.00) Dollars (the "PNC

Line of Credit"). A copy of the PNC Business Loan Agreement with ACI is attached as **Exhibit 3.**

110. On October 9, 2009, Kanaan executed a Guaranty and Suretyship Agreement in connection with the PNC Line of Credit (the "Guaranty"). See **Exhibit 4.**

111. Some of the proceeds of the PNC Line of Credit were used to satisfy the NatCity Line of Credit.

112. Contemporaneous with the closing on the PNC Line of Credit, the NatCity Letters of Credit were assumed by PNC.

113. The PNC Line of Credit was an asset-based revolving line of credit predicated on a formula based chiefly on the ACI accounts receivable.

114. The PNC formula allowed for advances based on eligibility as follows:

    i. Up to 85% of eligible accounts receivable, not to exceed 90 days from invoice date; and

    ii. Up to 75% of eligible unbilled accounts receivables of the ACI Outside Services Division to be invoiced within the succeeding 30 days and subject to documentation.

115. As with the NatCity Line of Credit, prior to an advance under the PNC Line of Credit, ACI was required to submit a Borrowing Base Certificate to PNC containing information regarding the ACI assets, specifically the ACI accounts receivable, from which the availability under the line could be determined (the "PNC BBC").

116. The advances made under the PNC Line of Credit were predicated on the information contained in the PNC BBCs.

117. The PNC BBCs were prepared by Johnson and/or Stone at the direction of MFalsetti.

118. At least some of the PNC BBCs were submitted by Stone and/or Johnson to PNC via email.

119. From about the time the PNC Line of Credit was extended to ACI, PNC conducted quarterly audits of the ACI books and records.

120. On information and belief, the quarterly audits conducted by PNC were performed to confirm the information contained in the PNC BBCs.

121. Boston & Associates, PC ("Boston & Associates"), a certified public accounting firm with offices in Rosemont, Pennsylvania conducted at least some of the quarterly audits of the ACI books and records of ACI on behalf of PNC.

122. On or about July 19, 2010, at the request of PNC, ACI retained the services of Aurora Management Partners ("Aurora") to provide consulting and professional development services to ACI. A copy of the engagement agreement with Aurora is attached as **Exhibit 5.**

123. The specific projects Aurora was engaged to perform included, among others, the following:

    i. Perform a detailed review of the historical and current financial results of the ACI operating units.

    ii. Review the existing debt services requirements to determine the ability of ACI's forecasts to accurately meet those requirements.

      iii. Review working capital assets to confirm that their levels are accurately represented in the financial reports/forecasts and identify opportunities to improve cash flow/working capital turns.

      iv. Review ACI's financial reporting capabilities and determine availability of data for reporting financial statements and performance metrics.

124. As evidence by the attached communication between the PNC loan officer and ACI, Aurora was involved in the PNC quarterly audits of ACI. See email dated between Celeste Zehren, a PNC loan officer, and MFalsetti dated May 23, 2011 attached as **Exhibit 6**.

125. On information and belief, on or about June 30, 2011, the outstanding balance on the PNC Line of Credit totaled approximately Twenty-Six Million Nine Hundred Sixty Thousand Four Hundred Eighty-Sever and 00/100 Dollars ($26,960,487.00) and the exposure on the PNC letters of credit was approximately One Millions Nine Hundred Fifty-Seven Thousand Ten and 00/100 Dollars ($1,957,010.00).

    **F.   ACI's Overstated Accounts Receivable**

126. In September 2003, ACI retained the services of NatCity Investments, Inc. (NatCity Investments") for the purpose of marketing ACI for sale.

127. Over the course of the following several months, NatCity Investments compiled a prospectus of use in marketing ACI.

128. Upon information and belief, in about September 2003, NatCity Investments identified a potential purchaser for ACI at a potential purchase price of approximately Thirty-Eight Million and 00/100 Dollars ($38,000,000.00).

129.   Based on a purchase price of Thirty-Eight Million and 00/100 Dollars ($38,000,000.00), the shareholders of ACI would have received value for their shares if a sale had closed in or about 2003.

130.   MFalsetti was not willing to proceed with the sale in 2003, and ACI ceased all marketing efforts.

131.   Sometime in late April 2011, Kanaan approached MFalsetti regarding the possible marketing of ACI to a targeted industry competitor Kanaan believed might be interested in acquiring ACI's assets and operations.

132.   At the suggestion that Kanaan intended to discuss the value of ACI with others in the marketplace, MFalsetti advised Kanaan that ACI could not be marketed due to improper reporting on its books and records.

133.   Kanaan was unaware of any financial reporting improprieties and unsure of the basis for MFalsetti's comments given his reluctance to sell ACI in the past.

134.   In accordance with prior practices, on May 11, 2011, MFalsettli and other ACI personnel, including Johnson, Stone and Kanaan, reviewed the ACI aged accounts receivable report in connection with ACI collection activity.

135.   On May 11, 2011, MFalsetti forwarded Kanaan and others an aged accounts receivable report reflecting Eleven Million Nine Hundred Forty-One Thousand Two Hundred Eighty-One and 51/100 Dollars ($11,941,281.51) in total accounts receivable (the "May 11 Accounts Receivable Report").  See **Exhibit 7.**[1]

136.   Kanaan had no reason to believe that the May 11 Accounts Receivable Report was not accurate.

---

[1] Due to the potential confidential nature of the information contained in Exhibit 7, Exhibit 7 will be submitted to the Court's chambers and a motion to file under seal is being filed contemporaneously with this Complaint.

137.   Kanaan had no reason to believe that Johnson, Stone and/or MFalsetti provided PNC with an aged accounts receivable report that differed from the May 11 Accounts Receivable Report.

138.   A few weeks after his initial comments regarding the inability of ACI to market itself, MFalsetti further informed Kanaan that Sirken had established bogus telephone lines in connection with the PNC audit of ACI.

139.   MFalsetti advised Kanaan that Sirken established the bogus telephone lines in order to have ACI personnel or other individuals acting on behalf of ACI confirm the falsified accounts receivable balances on behalf of customers with the PNC auditors.

140.   Upon information and belief, DFalsetti was given at least one of the phone lines established by Sirken in connection with the PNC audit.

141.   On June 10, 2011, MFalsetti advised Kanaan that it was "[h]ighly unlikely [ACI] will get through [the next regular field] audit." See copy of email from MFalsetti to Kanaan forwarded 9:37 a.m., June 10, 2011, attached as **Exhibit 8.**

142.   Shortly after sending the June 10, 2011 email advising Kanaan that he did not believe ACI would get through the next field audit, MFalsetti copied Kanaan on an email to Johnson in which he stated "Kristin, my opinion is there is now (sic.) way to get through this audit.  There (sic.) on to the receivables issues." See copy of email from MFalsetti to Johnson forwarded 9:52 a.m., June 10, 2011, attached as **Exhibit 9**.

143.   Concerned over the email communications regarding the audit and the accounts receivable, on June 13, 2011, Kanaan approached Stone and requested a copy

of the current aged accounts receivable report and the current PPC BBC.

144. Stone provided Kanaan with an aged accounts receivable report dated June 13, 2011, reflecting total accounts receivable in the amount of Seven Million Thirty-One Thousand Three Hundred Six and 38/100/100 ($7,031,306.38) Dollars as of June 13, 2011 (the "June 2011 AR Report"), a copy of which is attached as **Exhibit 10.**[2]

145. Stone also provided Kanaan with a PNC BBC which reflected total accounts receivable in the amount of Thirty-Six Million Eight Hundred Fifty-Six Thousand Two Hundred Thirteen and 62/100 ($36,856,213.62) Dollars, a copy of which is attached as **Exhibit 11**.

146. The June 2011 PNC BBC was transmitted to PNC by Johnson and/or Stone via email on or about June 16, 2011.

147. Upon information and belief, MFalsetti, Johnson, Stone and/or other individuals acting at their direction, submitted monthly borrowing base certificates to PNC beginning in about November 2009 all of which contained falsified accounts receivable information.

148. When questioned regarding the discrepancy between the aged accounts receivable report and the PNC BBC, Stone advised Kanaan that "we do what we have to do."

149. Immediately upon learning that Kanaan had requested a copy of the aged accounts receivable report and the borrowing base report, MFalsetti emailed Kanaan and advised not to "f___ with my people any more."

---

[2] Due to the potential confidential nature of the information contained in Exhibit 10, Exhibit 10 will be submitted to the Court's chambers and a motion to file under seal is being filed contemporaneously with this Complaint.

150.   Over the course of the following days, Kanaan attempted to determine the true status of the ACI accounts receivable and the information that had been reported to PNC.

151.   Unable to verify the accuracy of the reporting to PNC, Kanaan contacted PNC on June 23, 2011, to request copies of the most recent PNC BBC submitted by ACI.

152.   In late 2011, Celeste Zehren ("Zehren"), the PNC loan officer responsible for the ACI account, forwarded Kanaan a Borrowing Base Certificate dated June 16, 2011, executed by Johnson, reflecting total accounts receivable in the amount of Thirty-Five Million Two Hundred Four Thousand Six Hundred Fifty-Seven and 65/100 ($35,204,657.65) Dollars as of May 31, 2011 (the "June 2011 PNC BBC"). See June 2011 PNC BBC dated June 16, 2011 attached as **Exhibit 12**.

153.   A full aged accounts receivable report was submitted to PNC in support of the June 2011 PNC BBC reflecting the individual aged accounts. A copy of the full aged accounts receivable report submitted in support of the June 2011 PNC BBC is attached as **Exhibit 13.**[3]

154.   Zehren acknowledged that the discrepancy between the actual accounts receivable and the accounts receivable reported to PNC was "substantial" and advised Kanaan that PNC would be conducting a field audit of ACI beginning July 5, 2011. See email between Kanaan and Zehren dated June 29, 2011 attached as **Exhibit 14.**

155.   On June 23, 2011, Kanaan received reports that Falsetti and Johnson were shredding large numbers of documents in the offices of ACI. The reports

---

[3] Due to the potential confidential nature of the information contained in Exhibit 13, Exhibit 13 will be submitted to the Court's chambers and a motion to file under seal is being filed contemporaneously with this Complaint.

indicated that the shredding was of mass quantities of documents inconsistent with any of ACI's past practices.

156. The shredding continued throughout the week of June 23, 2011.

157. The documents that were shredded were under the control of Zautcke.

158. Upon information and belief, Zautcke was responsible for the oversight of the shredding that was conducted during the week of June 20, 2011.

159. Upon information and belief, the shredding of the documents during the week of June 20, 2011, was done at the direction of MFalsetti.

160. In an effort to frustrate the PNC audit, on July 1, 2011, Johnson forwarded an email to the ACI corporate offices advising that she would be out of the office the week of July 5, 2011, with limited access to email and phones. See **Exhibit 15.**

161. In a further effort to frustrate the efforts of the PNC auditors, on July 5, 2011, 2011, Stone forwarded an email to the ACI corporate offices advising that he would be working from home for the next few days. See **Exhibit 16.**

162. MFalsetti further frustrated the efforts of the PNC auditors on July 5, 2011, by forwarding an email advising that he too would not be in the office for the balance of the week with limited access to email and voicemail. See **Exhibit 17.**

163. MFalsetti, Johnson and Stone conspired to delay the access of the auditors to the ACI books and records.

164. Due to the absence of Stone, Johnson and MFalsetti during the week of July 5, 2011, none of the individuals with information regarding the financial affairs of ACI needed by the PNC auditors were available to assist the PNC auditors.

165.   In early July 2011, upon information and belief, PNC required ACI to bring Aurora on site to, among other things, facilitate with the communication between the Company and the auditors and to assist ACI in preparing its cash budgets for review and approval by PNC.

166.   On about July 12, 2011, Aurora prepared an aged accounts receivable report as of June 30, 2011 reflecting total accounts receivable in the amount of Eight Million Six Hundred Six Thousand Eight Hundred Ninety-Three and 36/100 ($8,606,893.36) Dollars (the "Aurora Receivables Report").  See **Exhibit 18.**[4]

167.   Aurora has continued to provide services to ACI since early July 2011 at a rate, upon information and belief, of approximately Twenty-Five Thousand and 00/100 Dollars ($25,000.00) per week.

168.   By mid-July 2012, PNC required Kanaan and MFalsetti to agree to forego their salaries.

169.   After about mid-July 2012, Aurora assisted ACI in preparing its cash budgets for PNC and managed all communication between ACI and PNC.

170.   In about mid-July 2012, Dave Baker of Aurora specifically advised Kanaan that he (Kanaan) was prohibited from having any direct contact with any representative of PNC.

171.   By about early August 2012, Dave Baker required ACI allow Aurora to take complete control of ACI financial affairs and accounting functions and advised Kanaan that if Aurora did not take complete control of the ACI financial affairs, PNC would immediately force ACI to cease all operations.

---

[4] Due to the potential confidential nature of the information contained in Exhibit 18, Exhibit 18 will be submitted to the Court's chambers and a motion to file under seal is being filed contemporaneously with this Complaint.

172. By early August 2012, PNC required Kanaan to agree to forego salary from ACI.

173. In about mid-September, MFalsetti and Dave Baker of Aurora altered Kanaan's duties with ACI and specifically prohibited Kanaan from contacting ACI customers.

174. Due to the continued lack of income from ACI, the change in his responsibilities with respect to customers and the control exercised by Aurora, Kanaan resigned his position from ACI on October 14, 2011.

175. Due to the overstated accounts receivable and over funding by PNC, the ACI shares had no value on October 14, 2011 and continue to have no value.

176. Any value Kanaan anticipated receiving from his 28 years devoted to building the ACI business has been destroyed by the fraudulent financial reporting by MFalsetti, Johnson, Stone and others.

177. PNC has filed suit against Kanaan based upon the fraudulent accounting prepared by MFalsetti, Johnson, Stone and others and submitted to PNC. See *Amended Complaint, PNC Bank, National Association, Successor to National City Bank as Lender and As Agent for Lenders v. Daniel Kanaan*, United States District Court, Eastern District of Pennsylvania, Civil Action no. 11-7770 (RBS), attached as **Exhibit 19,** without exhibits.

    **G.    Predicate Acts - ACI**

178. The accounts receivable reflected on the June 2011 PCN BBC were over stated by more than Twenty-Five Million and 00/100 ($25,000,000.00) Dollars.

179. From at least mid-November 2009 through about June 16, 2011, MFalsetti, Johnson, Stone and/or other individuals or agents on their behalf and on behalf

of ACI transmitted via email a monthly Borrowing Base Certificate to PNC in support of the advances made on the PNC Line of Credit.

180. The accounts receivable reflected on each of the Borrowing Base Certificates submitted by MFalsetti, Johnson, Stone and/or other individuals or agents on their behalf to PNC were grossly overstated.

181. MFalsetti, Johnson, Stone and/or unnamed individuals or agents on their behalf overstated the accounts receivable reflected on the Borrowing Base Certificates submitted to PNC with the intent to fraudulently induce PNC to advance funds on the PNC Line of Credit to ACI.

182. As a result of the fraudulently overstated accounts receivable, PNC in fact advanced funds to ACI well beyond the actual availability under the PNC Line of Credit.

183. Kanaan was never involved in the preparation of the accounts receivable reports relied upon in preparing the Borrowing Base Certificates submitted to PNC.

184. Kanaan never reviewed or forwarded any of the Borrowing Base Certificates submitted by ACI to PNC.

185. From October 2009 through July 2011, PNC performed quarterly audits of the books and records of ACI to confirm the information reflected on the Borrowing Base Certificates submitted by ACI.

186. During the time PNC was conducting quarterly audits of ACI, Aurora was providing consulting services to ACI.

187. The consulting services provided by Aurora included a review of ACI's cash budgets.

188.   Upon information and belief, in performing its consulting services Aurora reviewed the financial records of ACI.

189.   For the fiscal years ending January 31, 2006 through 2010, UHY LLP ("UHY") prepared audited financial statements for ACI.

190.   For the fiscal year ending January 31, 2009, UHY reported accounts receivable in the amount of Twenty Nine Million Nine Hundred Eighty-Five Thousand Two Hundred Twenty and 00/100 ($29,885,220.00) Dollars.   See ACI Audited Financial Statements and Supplemental Information for Years Ended January 31, 2010 and 2009 attached as **Exhibit 20.**

191.   For the fiscal year ending January 31, 2010, UHY reported accounts receivable in the amount of Thirty-Three Million Three Hundred Sixty-Four Thousand Eight Hundred Sixty-Five and 00/100 ($33,364,865.00) Dollars.  See **Exhibit 20.**

192.   UHY prepared a draft of an audited financial statement for the fiscal year ending January 31, 2011 which reflected accounts receivable in the total amount of Thirty-Five Million Three Hundred Thousand Four Hundred Sixty and 00/100 ($35,300,460.00) Dollars.   See Draft ACI Audited Financial Statements and Supplemental Information for Years Ended January 31, 2011 and 2010 attached as **Exhibit 21.**

193.   MFalsetti, Johnson and Stone were responsible for providing financial information to UHY.

194.   MFalsetti, Johnson and Stone were responsible for providing financial information to the PNC auditors.

195. MFalsetti, Johnson and Stone were responsible for providing financial information to Aurora.

196. Based upon the information contained in the June 2011 AR Report and the Aurora Receivables Report, the ACI accounts receivable reported to UHY were substantially overstated for all fiscal years ending January 31, 2008, 2009, 2010 and 2011.

197. MFalsetti, Johnson and/or Stone provided false and misleading information to UHY, the ACI auditors, regarding the ACI accounts receivable with the intent that UHY would rely on such information and would overstate the accounts receivable reflected on the audited financial statements prepared by UHY.

198. MFalsetti, Johnson and/or Stone provided false and misleading information to UHY regarding the ACI accounts receivable with the intent that UHY would rely on such information and would overstate the accounts receivable reflected on the Forms 1120, United States Corporate Income Tax Returns, prepared by UHY.

199. Based upon the information contained in the June 2011 AR Report and the Aurora Receivables Report, the ACI accounts receivable reported to the PNC auditors were substantially overstated for all periods during which PNC conducted its audits.

200. MFalsetti, Johnson and/or Stone provided false and misleading information to the PNC auditors regarding the ACI accounts receivable with the intent that PNC auditors would rely on such information and would confirm the overstated accounts receivable reflected on Borrowing Base Certificates submitted to PNC.

201.   MFalsetti, Johnson and/or Stone provided false and misleading information to the PNC auditors regarding the ACI accounts receivable with the intent that PNC would continue to advance funds under the PNC Line of Credit beyond the amount ACI was eligible to receive.

202.   Upon information and belief, MFalsetti, Johnson, Sirken, and/or DFalsetti established fraudulent telephone and email accounts for customers which were provided to the PNC auditors in order to conceal the true value of the accounts.

203.   Upon information and belief, MFalsetti, Johnson, Sirken, and/or DFalsetti responded to inquiries from the PNC auditors made on the fraudulently telephone and email accounts to verify the false information in the PNC BBCs.

204.   Based upon the information contained in the June 2011 AR Report and the Aurora Receivables Report, the accounts receivable reflected in the June 2011 PNC BBC were substantially overstated and over reported to PNC by Stone, Johnson and MFalsetti.

205.   MFalsetti, Johnson and/or Stone provided false and misleading financial and accounting information to PNC on the Borrowing Base Certificate regarding the ACI accounts receivable with the intent that PNC would rely on such information and would issue over advances on the PNC Line of Credit.

206.   The accounts receivable reflected on all Borrowing Base Certificates submitted to PNC in connection with the PNC Line of Credit were substantially overstated.

207.   During the time that erroneous Borrowing Base Certificates were being submitted to PNC, ACI continued to issue accurate invoices to its customers.

208. Upon information and belief, during the time that erroneous Borrowing Base Certificates were being submitted to PNC, ACI continued to maintain records reflecting its accurate accounts receivable.

209. Upon information and belief, in order to maintain accurate accounts receivable records for purposes of invoicing customers while contemporaneously maintaining the erroneous records regarding accounts receivable provided to UHY, the PNC auditors and Aurora, MFalsetti, Johnson, Stone, Sirken and others acting on behalf of ACI maintained of a duplicate set of accounts receivable records.

210. Upon information and belief, as the CIO, Sirken assisted MFalsetti, Johnson and/or Stone in establishing a duplicate accounting program to support the erroneous accounts receivable reports.

211. Upon information and belief, Weiner assisted Sirken, MFalsetti, Johnson and/or Stone in establishing a duplicate accounting program to support the erroneous accounts receivable report.  Specifically, among other things, Weiner assisted Johnson in creating the pass codes for both the true as well as the erroneous duplicate accounting records.

212. MFalsetti, Johnson, Sirken, Stone and other unnamed co-conspirators conspired to create a duplicate set of records regarding the ACI accounts receivable.

213. MFalsetti, Johnson, Sirken, Weiner, Stone and other unnamed co-conspirators conspired to submit false and fraudulent Borrowing Base Certificates to PNC in order to generate advances beyond ACI's eligibility for borrowing.

214. Zautcke and other unnamed co-conspirators conspired with MFalsetti, Johnson, Stone, Sirken and/or Winer to conceal the duplicate set of accounting records maintained by ACI by, among other things, shredding the records that if discovered would have disclosed the overstated receivables.

215. DFalsetti and other unnamed co-conspirators conspired with MFalsetti and Sirken to conceal the overstated accounts receivable by falsely reporting the value of the ACI receivables in telephone and/or electronic inquires from the PNC auditors.

216. On information and belief, based upon the substantial amount of over advanced funds from PNC based on the over stated and over reported accounts receivable, Defendants have diverted the over advanced funds to their personal benefit.

### H. Predicate Acts – M&D, FKS and Falkan

217. MFalsetti has acted as the managing member of M&D since its organization.

218. Prior to June 2011, M&D maintained a deposit and checking account at a PNC branch in Canton, Michigan.

219. Without the consent of Kanaan, MFalsetti and/or Johnson opened the M & D CD in an effort to conceal the funds from the ACI auditors.

220. In about February 2011, without advising Kanaan, MFalsetti and Johnson removed Kanaan as a signatory to the M&D PNC checking account.

221. MFalsetti and/or Johnson maintained the books and records of M&D.

222. For the tax year ending December 31, 2010, M&D reported gross receipts of Seven Hundred Seven Thousand Three Hundred Forty and 00/100

($707,340.00) Dollars. See M&D Auto, LLC, Form 1065, U.S. Return of Partnership Income, **Exhibit 22**.

223. During the period July 1, 2010 through December 31, 2010, One Million Forty-One Thousand Seven and 69/100 ($1,041,007.69) Dollars were deposited into the M&D checking account maintained at PNC. **Exhibit 23.**

224. Upon information and belief, MFalsetti and/or Johnson failed and/or refused to provide UHY with the bank records for M&D prior to the preparation of the December 31, 2010 M&D Form 1065.

225. Despite repeated requests from Kanaan, MFalsetti has failed and/or refused to account for the funds deposited into the M&D account.

226. On information and belief, the funds deposited into the M&D account rightfully belonged to ACI.

227. On information and belief, MFalsetti, Johnson and other unnamed co-conspirators used the M&D bank accounts to conceal the true income of ACI from the ACI and PNC auditors.

228. MFalsetti has acted as the managing member of FKS since its organization.

229. Despite repeated requests from Kanaan, MFalsetti has failed and/or refused to provide information and/or access to Kanaan of the books and records, including specifically the banking records, of FKS.

230. MFalsetti and/or Johnson maintained the books and records of FKS.

231. On information and belief and based upon the substantial amount of funds missing from ACI that were generated by the over stated and over reported

accounts receivable, the accounts of FKS were used to conceal funds rightfully belonging to ACI.

232. MFalsetti has acted as the managing member of Falkan since is organization.

233. Despite repeated requests from Kanaan, MFalsetti has failed and/or refused to provide information and/or access to Kanaan of the books and records, including specifically the banking records, of Falkan.

234. MFalsetti and/or Johnson maintained the books and records of Falkan.

235. On information and belief, based upon the substantial amount of funds missing from the ACI that were generated by the over stated and over reported accounts receivable, the accounts of Falkan were used to conceal funds rightfully belonging to ACI.

**COUNT I**
**ACTION FOR ACCOUNTING – ACI**

236. Kanaan incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 235 of this Complaint.

237. Kanaan is entitled to an accounting of the operations of ACI at the expense of the Defendants.

238. Kanaan is entitled to an accounting of the Defendants' finances at the Defendants' expense.

**COUNT II**
**ACTION FOR ACCOUNTING – M&D**

239. Kanaan incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 238 of this Complaint.

240.  Kanaan is entitled to an accounting of the operations of M&D at the expense of MFalsetti.

241.  Kanaan is entitled to an accounting of MFalsetti's personal finances at MFalsetti's expense.

## COUNT III
## ACTION FOR ACCOUNTING – FKS

242.  Kanaan incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 241 of this Complaint.

243.  Kanaan is entitled to an accounting of the operations of FKS at the expense of MFalsetti.

244.  Kanaan is entitled to an accounting of MFalsetti's personal finances at MFalsetti's expense.

## COUNT IV
## ACTION FOR ACCOUNTING – FALKAN

245.  Kanaan incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 244 of this Complaint.

246.  Kanaan is entitled to an accounting of the operations of FALKAN at the expense of MFalsetti.

247.  Kanaan is entitled to an accounting of MFalsetti's personal finances at MFalsetti's expense.

## COUNT V
## BREACH OF FIDUCIARY DUTIES
## AS TO MFALSETTI and JOHNSON

248.  Kanaan incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 247 of this Complaint.

249. MFalsetti is the President of ACI and is a fellow shareholder of Kanaan.

250. At the time of her resignation from ACI, Johnson was the Secretary and Treasurer of ACI.

251. MFalsetti and Johnson had a common law duty and a specific statutory obligation under MCL §450.1541(a) to perform their duties prudently and in the best interest of ACI and a separate fiduciary duty to Kanaan as a shareholder.

252. MFalsetti, Johnson and Sirken breached his duty to Kanaan and ACI by, among other matters:

    a.    Submitting false and fraudulent financial information to PNC and thereby causing PNC to over advance under the PNC Line of Credit.

    b.    Maintaining duplicate books and records regarding the ACI accounts receivable.

    c.    Submitting false and fraudulent financial information to UHY and the PNC auditors auditing the ACI financial records.

    d.    Diverting ACI funds to accounts maintained in the names of M&D, FKS and/or Falkan.

253. Johnson breached her fiduciary duty to ACI and Kanaan by aiding and abetting MFalsetti in the above breaches of fiduciary duty through her role as CFO and by acting in concert with Falsetti.

254. Sirken breached his fiduciary duty to ACI and Kanaan by aiding and abetting MFalsetti in the above breaches of fiduciary duty through his role as CIO and by acting in concert with MFalsetti and/or Johnson.

255. Falsetti, Johnson and Sirken breached their duties to Kanaan and ACI causing Kanaan and ACI to suffer continuing damages, including, but not limited to, monetary damages.

## COUNT VI
## SHAREHOLDER OPPRESSION

256.   Plaintiff incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 255 of this Complaint.

257.   The actions of MFalsetti have been unlawful, fraudulent and willfully unfair and oppressive to Kanaan.  Among other matters, and without limitation, MFalsetti has engaged in the following unlawful activity:

a.     Submitting false and fraudulent financial information to PNC and thereby causing PNC to over advance under the PNC Line of Credit.

b.     Maintaining duplicate books and records regarding the ACI accounts receivable.

c.     Submitting false and fraudulent financial information to UHY and the PNC auditors auditing the ACI financial records.

d.     Diverting funds over advanced by PNC to ACI for his personal use.

e.     Causing ACI to be overextended in its debt obligations for his own personal benefit and to the detriment of Kanaan.

f.     Altering Kanaan's duties and responsibilities without Kanaan's consent.

g.     Attempting to improperly redeem Kanaan's stock.

h.     Generally mismanaging ACI and causing ACI to incur excess fees to consultants to the detriment of ACI and its shareholders.

i.     Generally mismanaging ACI and causing ACI to fail to pay its obligations owed to various taxing authorities and thereby incurring interest and penalties on its tax obligations to the detriment of ACI and its shareholders.

j.     Generally mismanaging ACI and causing ACI default on its obligations to creditors, including but not limited to PNC and Fifth Third Bank, to the detriment of ACI and its shareholders.

258.   The remaining Defendants have aided and abetted MFalsetti in the above oppressive conduct

259. Pursuant to MCL §450.1489, this Court has the power to, among other things, cancel or alter provisions contained in ACI's Articles of Incorporation and Bylaws and thereby remove MFalsetti from his position as President of ACI and to otherwise enjoin Falsetti from continued involvement with ACI.

260. Pursuant to MCL §450.1489, this Court has the power to, among other things, cancel or alter provisions contained in ACI's Cross-Purchase Agreement and set aside any efforts by MFalsetti to effectuate the redemption of the Kanaan stock. See **Exhibit 24.**

### COUNT VII
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### Conspiracy to Conduct the Affairs of the Enterprise through a Pattern of Racketeering Activity in Violation of 18 U.S.C. § 1962(c)

261. Plaintiff incorporates by reference as if fully set forth the allegations contained in paragraphs 1 through 260 of this Complaint.

262. Each of the Defendants is a "person," within the meaning of that term under 18 U.S.C. §§ 1961(3) and 1962.

263. At all times relevant hereto, the Defendants were associated with ACI, an enterprise engaged in activities which affect interstate commerce.

264. The Defendants are distinct from ACI.

265. Separate and distinct from ACI, the Defendants formed a RICO enterprise consisting of the individuals acting in concert to falsify the accounting records of ACI (the "RICO Enterprise").

266. The RICO Enterprise is separate and distinct from ACI and from the individuals that participated in it and directed its affairs.

267. The Defendants engaged in a pattern of racketeering activity separate from the activities of ACI as follows:

   a.     Preparing falsified accounting records relative to the ACI accounts receivable.

   b.     Transmitting the falsified accounting records relative to the ACI accounts receivable to PNC via wire transmission.

   c.     Establishing and utilizing fraudulently established telephone and email accounts created as bogus customer accounts to respond to inquiries from the PNC auditors.

   d.     Fraudulently inducing PNC to over advance funds under the PNC Line of Credit based upon the falsified accounting records.

   e.     Using telephonic means to falsely verify for the PNC auditors the falsified ACI accounts receivable.

   f.     Destroying the ACI documents relative to the falsified accounting records relative to the accounts receivable.

268. The pattern of racketeering activity is separate and distinct from ACI and differs from ACI's usual and ordinary daily activities.

269. Defendants conducted and/or participated in the affairs of the RICO enterprise in violation of 18 U.S.C. § 1962(c).

270. The "predicate acts" committed by the Defendants are wire fraud as defined by 18 U.S.C. § 1343, financial institution fraud as defined by 18 U.S.C. § 1344 and obstruction of justice as defined by 18 U.S.C. § 1503.

271. Each of the acts indictable under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (financial institution fraud) and 18 U.S.C. § 1503 (obstruction of justice), the specifics of which are set out more fully herein, involved the Defendants knowingly causing the use of the interstate wire facilities, with the specific intent and for the purpose of executing a scheme or artifice to defraud and to engage in a pattern designed to obstruct and investigation of the fraudulent scheme in that each was material and incidental to an essential element of the scheme.

272. The Defendants engaged in a scheme to defraud through the use of interstate wire facilities to transmit intentionally falsified financial data to PNC with the intent of defrauding PNC for their own benefit.

273. The Defendants engaged in a scheme to defraud PNC and thereby Kanaan, through the use of interstate wire facilities to continue the concealment of their fraud on PNC by falsely verifying to the PNC auditors the falsified financial data submitted to PNC with the intent of continuing the fraud perpetrated on PNC for their own benefit.

274. In violation of 18 U.S.C. § 1503, the Defendants engaged in a scheme to obstruct justice by interfering with any possible investigation of the fraud perpetrated on PNC by destroying the documents associated with their fraud.

275. As a direct and proximate result of the Defendants scheme to defraud PNC Defendants have deprived Kanaan of the value of his stock in ACI causing Kanaan direct damages and substantial loss of property, and as a consequence Kanaan is entitled to treble damages and attorney fees pursuant to 18 U.S.C. § 1964.

## COUNT IX
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### Conspiracy to Conduct the Affairs of the Enterprise through a Pattern of
### Racketeering Activity in Violation of 18 U.S.C. § 1962(b)

276.    Plaintiff incorporates by reference as if fully set forth the allegations contained in

paragraphs 1 through 275 of this Complaint.

277.    Through their pattern of racketeering activity, the Defendants have maintained an

interest in or control over ACI in violation of 18 U.S.C. § 1962(b).

278.    Specifically, Defendant MFalsetti continues to hold an officer and director

position with ACI and together with the remaining Defendants continues to

control the operations of ACI.

279.    As a direct and proximate result of the Defendants' continued interest in, or

control over, ACI, in violation of  18 U.S.C. § 1962(b), Kanaan has suffered direct

damages and substantial loss of property, including the loss of the value of his

interest in ACI, and is entitled to treble damages and attorney fees pursuant to 18

U.S.C. § 1964.

## COUNT X
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### Conspiracy to Conduct the Affairs of the Enterprise through a Pattern of
### Racketeering Activity in Violation of 18 U.S.C. § 1962(d)

280.    Plaintiff incorporated by reference as if fully set forth the allegations contained in

paragraphs 1 through 279 of this Complaint.

281.    The Defendants have conspired to violate the Racketeer Influenced and Corrupt

Organizations Action, 18 U.S.C. §§ 1962(b) and (c), as set forth herein.

282.    As a direct and proximate result of the Defendants conspiracy to violate 18

U.S.C. §§ 1962(b) and (c), Kanaan has suffered direct and substantial damages,

including but not limited to the loss of value of his interest in ACI, and Kanaan is therefore entitled to treble damages and attorney fees under 18 U.S.C. §§ 1964.

### PRAYER FOR RELEIF

**WHEREFORE**, Kanaan respectfully requests that this Court:

a.   Enter judgment in favor of Kanaan and requiring the Defendants to submit full, complete and accurate account of all records of ACI, M&D, FKS and FALKAN.

b.   Enter judgment in favor of Kanaan and requiring the Defendants to submit full, complete and accurate account of all records of Defendants' personal finances.

c.   Enter judgment in favor of Kanaan and requiring Defendant Michael Falsetti to resign his position as President of ACI.

d.   Enter judgment in favor of Kanaan and altering the terms of the Cross-Purchase Agreement to prevent the redemption of the Kanaan stock in ACI.

e.    Enter judgment in favor of Kanaan rescinding and avoiding any attempts by Defendants Michael Falsetti and ACI from redeeming the Kanaan stock in ACI.

f.   Enter judgment in favor of Kanaan and against the Defendants for compensatory damages, in an amount to be proven at trial, together with costs, prejudgment interest, and post-judgment interest.

g.    Enter judgment in favor of Kanaan and against the Defendants for trebled compensatory damages, in an amount to be proven at trial, together with costs, prejudgment interest, and post-judgment interest.

h.    Enter judgment in favor of Kanaan and against the Defendants for punitive damages and attorney fees, as permitted by the applicable statutory law and common law.

i.    Award any additional and further relief as deemed just and appropriate.

**I DECLARE THAT THE STATEMENTS CONTAINED HEREIN ARE TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF.**

DANIEL P. KANAAN

Respectfully submitted,

Strobl & Sharp, P.C.

/ S /

Lynn M. Brimer (P43299)
George S. Fish (P51298)
Attorneys for Plaintiff
300 East Long Lake Road, Suite 200
Bloomfield Hills MI 48304-2376
(248) 205-2764  Fax (248) 205-2788
lbrimer@stroblpc.com
gfish@stroblpc.com

Dated:  April 13, 2012

J:\DOCS\85033\007\PLDG\SB340421.DOC